382 S.E.2d 327

**STATE of West Virginia**

v.

**Michael Wayne WEAVER.**

**No. 18915.**

Supreme Court of Appeals of West Virginia.

June 16, 1989.

Hugh Rogers, Jr., Kerens, for Weaver.

Thomas Gillooly, Atty. General's Office, Charleston, for the State.

MILLER, Justice:

The defendant, Michael Wayne Weaver, was convicted in Preston County Circuit Court[1] of first degree sexual assault, at-

---

1. The defendant was indicted in Randolph County but, on motion for a change of venue, was tried in Preston County Circuit Court.

tempt to kill or injure by poison or other destructive thing, and abduction of a minor child for immoral purposes. Three assignments of error are presented: (1) that an alcoholic beverage is not a "poison or other destructive thing" under W.Va.Code, 61–2–7; (2) that the abduction was merely incidental to the assault and was not, therefore, separately punishable; and (3) that the State failed to timely disclose the identity of certain witnesses in its discovery. We affirm.

## I.

On July 8, 1987, Lisa C. and Lantz R.,[2] both eight years of age, met the defendant as they walked along the railroad tracks in south Elkins. The defendant struck up a conversation and the threesome headed downtown. While they were downtown, the defendant purchased some soft drinks for the children and accompanied them to a city park. They played hide and seek at the park for about one-half hour. The defendant, who was in possession of a bottle of wine, soon became fearful of police harassment and left the park. The defendant and the children walked a short distance to a wooded hillside.

While they were in the woods, Lisa and Lantz drank some wine from the defendant's bottle. There is considerable dispute about the circumstances of the wine drinking. The defendant said that the children asked to taste the wine and he replied: "[W]hy not?" In his testimony, Lantz stated that the defendant told the children to drink the wine and that they did so out of fear. Lisa corroborated Lantz's testimony,

but added that the defendant pointed a knife at her and called her a bitch.

Some time later Lantz left the woods, either of his own volition or at the defendant's instruction.[3] When he returned to the woods, the defendant and Lisa were gone. Lantz immediately went to the home of his uncle, who telephoned the police.

When the police arrived at about 8:00 p.m., Lantz directed them to the scene. Two policemen searched for the defendant and Lisa in heavy underbrush. One of the policemen located them a distance of 100 to 150 yards away. When he approached, the policeman saw Lisa lying on the ground with the defendant on top of her. Lisa's shorts were removed and her panties were pulled down to her ankles. The defendant's head was in Lisa's vaginal area.

When she was found by the policeman Lisa was semiconscious, smelled of alcohol, and vomited numerous times. Her blood alcohol level was reported to be .21 of one percent, more than twice the statutory level of intoxication.[4] She was treated by paramedics at the scene and was immediately transported by them to the hospital. While at the hospital Lisa suffered a cardiac arrest, but was resuscitated. A medical doctor testified that the cardiac arrest was caused by excessive consumption of alcohol.

## II.

The defendant was convicted of "administer[ing], or attempt[ing] to administer, [a] poison or other destructive thing ... with intent to kill or injure another person," in violation of W.Va.Code, 61–2–7.[5] The de-

2. We follow our customary practice in cases that involve sensitive facts concerning minor children and do not use their full names. *E.g., State v. Murray,* 180 W.Va. 41, 375 S.E.2d 405 (1988); *Committee on Legal Ethics v. Douglas,* 179 W.Va. 490, 370 S.E.2d 325 (1988); *James G. v. Caserta,* 175 W.Va. 406, 332 S.E.2d 872 (1985).

3. Lantz's testimony was that the defendant "told [him] to go down [the hill] and look and see if there was [*sic*] any cars." The defendant stated simply that Lantz "wandered off" the hill.

4. Under W.Va.Code, 17C–5–8(c), "[e]vidence that there was ... ten hundredths of one per-

cent or more, by weight, of alcohol in his blood, shall be admitted as prima facie evidence that the person was under the influence of alcohol."

5. W.Va.Code, 61–2–7, provides in its entirety:
"If any person administer, or attempt to administer, any poison or other destructive thing in food, drink, medicine or otherwise, or poison any spring, well, reservoir, conduit or pipe of water, with intent to kill or injure another person, he shall be guilty of a felony, and upon conviction, shall be confined in the penitentiary not less than three nor more than eighteen years."
Some jurisdictions, either by statute or by case law, deem poisoning to be punishable as an

fendant now asserts, as he did below, that an alcoholic beverage is not a "poison or other destructive thing" under that statute.[6] We note initially that our statute does not define the term "poison" or its companion term "other destructive thing." However, these two terms, read together, negate any argument that the statute was intended to be narrowly construed.

Even the term "poison" itself has not been confined to some highly technical or restrictive definition. Courts which have considered the meaning of the term focus primarily on the deleterious effect of the substance on the body. Typical is the definition set out in *Watkins v. National Electric Products Corp.*, 165 F.2d 980, 982 (3d Cir.1948), where the Third Circuit quoted with approval the district court's definition and then offered its own observations:

"We have no doubt that 'poison' as used in common parlance is not limited to 'systemic poison' which the doctor was speaking of in this case. The District Court found a wider definition in Corpus Juris which it applied. It runs as follows: 'Poison may be defined as any substance which, where introduced into the system either directly or by absorption produces violent, morbid, or fatal changes, or which destroys living tissue with which it comes in contact.' *Watkins v. National Electric Products Co.*, D.C., W.D.Pa., 1947, 69 F.Supp. 596, 598. Turning to the dictionary, we find a not dissimilar statement: 'Poison * * * Any agent which, introduced * * * into an organism, may chemically produce an injurious or deadly effect * * *.' When

we turn to judicial use for the word we find the same broad meaning carried through which emphasizes the introduction of the poisonous substance into the body and the resulting harm.... *State v. Baldwin*, 1886, 36 Kan. 1, 12 P. 318; *Urian v. Scranton Life Insurance Co.*, 1933, 310 Pa. 144, 165 A. 21; *United Fidelity Life Ins. Co. v. Roach*, Tex.Civ. App. 1933, 63 S.W.2d 723." (Footnote omitted).

*See also People v. Van Deleer*, 53 Cal. 147 (1878); *Boswell v. State*, 114 Ga. 40, 39 S.E. 897 (1901); *Runnels v. State*, 45 Tex. Crim. 446, 77 S.W. 458 (1903).

Much the same practical approach has been followed in cases stemming from the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq.* While such terms as "poisonous," "deleterious character," "adulterated," and "filth" are not defined in that statute, courts have interpreted them in accordance with common usage. The United States Supreme Court in *Flemming v. Florida Citrus Exchange*, 358 U.S. 153, 163, 79 S.Ct. 160, 167, 3 L.Ed.2d 188, 195 (1958), made this statement about the federal statute: "[T]he words 'harmless' and 'poisonous' are relative words, referring not to the effect of a substance *in vacuo*, but to its effect, taken in a particular way and in particular quantities, on an organic system." *See also United States v. H.B. Gregory Co.*, 502 F.2d 700 (7th Cir.1974), *cert. denied*, 422 U.S. 1007, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975); *United States v. Morton–Norwich Prod., Inc.*, 461 F.Supp. 760 (N.D.N.Y.1978); *United States v. General Foods Corp.*, 446

---

assault or battery. *E.g., Harris v. State*, 106 Ga.App. 172, 126 S.E.2d 693 (1962) (assault and battery); *State v. Boehme*, 71 Wash.2d 621, 430 P.2d 527 (1967), *cert. denied*, 390 U.S. 1013, 88 S.Ct. 1259, 20 L.Ed.2d 164 (1968) (assault); La. Stat.Ann. 14:33 (battery); V.I.Code Ann. tit. 14, § 295 (assault); 2 Wharton's Criminal Law § 184 (14th ed. 1979). Others, like West Virginia, have specialized statutes that prohibit the administration of poisons with the intent to injure or kill another. *E.g.,* Cal.Penal Code § 347; Idaho Code § 18–5501; Mass.Gen.Laws Ann. ch. 265, § 28; Mich.Stat.Ann. § 750.436; Okla.Stat.Ann. tit. 21, § 832; R.I.Gen.Laws § 11–16–5; S.D.Codified Laws Ann. § 34–20–23; Va.Code 18.2–54.1.

**6.** The State claims that the defendant failed to object when evidence of Lisa's injury was admitted and that he, therefore, waived the error. We disagree. The defendant moved *in limine* to exclude all evidence of Lisa's injury. In its discussion, the circuit court stated that one of the questions presented by the motion was whether "alcoholic beverages are within the [poisoning] statute." The court concluded that alcoholic beverages were within the statute, and denied the motion. The defendant objected. This was sufficient to preserve the error. *Wimer v. Hinkle*, 180 W.Va. 660, 379 S.E.2d 383 (1989) ("[A]n objection to an adverse ruling on a motion *in limine* ... will preserve the point.").

F.Supp. 740 (N.D.N.Y.1978), *aff'd*, 591 F.2d 1332 (2d Cir.1978); *United States v. 1200 Cans. Pasteurized Whole Eggs*, 339 F.Supp. 131 (N.D.Ga.1972).

In a somewhat related area of statutory interpretation, we considered in *State v. Choat*, 178 W.Va. 607, 363 S.E.2d 493 (1987), what was meant by the phrase "dangerous or deadly weapon" under W.Va.Code, 61–7–1 (1975). We sanctioned language from Syllabus Point 1 of our earlier case of *Village of Barboursville ex rel. Bates v. Taylor*, 115 W.Va. 4, 174 S.E. 485 (1934), to the effect that a weapon "is a dangerous weapon within the statutory meaning if in its intended or readily adaptable use it is *likely* to produce death or serious bodily harm." (Emphasis in original).

In this case, we believe it would be obvious to the average person that alcohol taken in quantity can have a destructive effect on the body of a child. Equally apparent is the fact that the lighter the body weight, the more toxic and destructive a given amount of alcohol becomes.[7] We need not pinpoint whether alcohol is a "poison," as the statute uses that term, or an "other destructive thing." It is sufficient to state that a substance is a "poison or other destructive thing" under W.Va.Code, 61–2–7, if the defendant knows or reasonably should know that in the quantity administered it will have a poisonous or destructive effect on the victim such that it may injure or kill.

■ In this case, the victim was eight years of age and weighed fifty pounds. While there is no evidence of the quantity of alcohol that Lisa consumed, there is

evidence that her blood alcohol level was .21 of one percent at the time she was taken to the hospital. There is also no dispute that as a result, she suffered a substantial injury, i.e., a cardiac arrest.[8] In view of these facts, we find that the jury could properly find a violation of W.Va. Code, 61–2–7.

### III.

The defendant next argues that Lisa's abduction was incidental to the sexual assault and that, under the principles of *State v. Miller*, 175 W.Va. 616, 336 S.E.2d 910 (1985), he cannot be convicted of both abduction and assault.

A review of the *Miller* case provides a useful starting point. We considered in *Miller* the reach of our general kidnapping statute, W.Va.Code, 61–2–14a. Since kidnapping was so broadly defined,[9] virtually any movement or detention of a person during the commission of another crime fell within the kidnapping statute. For this reason, it was necessary to develop "some reasonable limitations on the broad scope of kidnapping." 175 W.Va. at 621, 336 S.E.2d at 915. We summarized these limitations in Syllabus Point 2:

"In interpreting and applying a generally worded kidnapping statute, such as W.Va.Code, 61–2–14a, in a situation where another offense was committed, some reasonable limitations on the broad scope of kidnapping must be developed. The general rule is that a kidnapping as not been committed when it is incidental to another crime. In deciding whether the acts that technically constitute kid-

---

7. A blood alcohol level of .10 of one percent is considered toxic. A level of as little as .30 or .40 of one percent may be lethal. J. Arena, *Poisoning: Toxicology, Symptoms, Treatments* (4th ed. 1979); *Diagnostic and Statistical Manual of Mental Disorders III* (1985). One textwriter has noted that "[t]he toxic potentialities of the imbibing of alcoholic beverages in children should never be overlooked or minimized." J. Arena, *supra* at 209. It is estimated that the "fatal dose" of alcohol for a child is from 250 to 500 grams. J. Arena, *supra* at 209.

8. Merely making the victim intoxicated would not be a substantial injury.

9. W.Va.Code, 61–2–14a, the kidnapping statute, provides, in part, as follows:

"If any person, by force, threat, duress, fraud or enticement take, confine, conceal, or decoy, inveigle or entice away, or transport into or out of this State or within this State, or otherwise kidnap any other person, for the purpose or with the intent of taking, receiving, demanding or extorting from such person, or from any other person or persons, any ransom, money or other thing, or any concession or advantage of any sort, ... he shall be guilty of a felony[.]"

napping were incidental to another crime, courts examine the length of time the victim was held or moved, the distance the victim was forced to move, the location and environment of the place the victim was detained, and the exposure of the victim to an increased risk of harm."

This case involves W.Va.Code, 61–2–14, commonly referred to as the abduction statute. We explained in *Miller* that W.Va.Code, 61–2–14, antedated our general kidnapping statute and was drawn from two earlier Virginia statutes. As presently codified, the abduction statute defines two distinct offenses, *viz.*, abduction with intent to marry or defile and abduction of a minor child for immoral purposes. The latter, for which the defendant was convicted, reads as follows:

"(b) Any person, other than the father or mother, who illegally, or for any unlawful, improper or immoral purpose other than the purposes stated in subsection (a) of this section or section fourteen-a or fourteen-c [§ 61–2–14a or 62–2–14c] of this article, seizes, takes or secretes a child under sixteen years of age, from the person or persons having lawful charge of such child, shall be guilty of a felony, and, upon conviction thereof, shall be confined in the penitentiary not less than one nor more than ten years."

■ The defendant now seeks to apply the limitations set out in *Miller* to the abduction statute. We find support for this proposition. Even before *Miller* was decided, we resorted to a *Miller*-type analysis in cases decided under the abduction statute. For example, in *State v. Trail*, 174 W.Va. 656, 328 S.E.2d 671 (1985), the defendant struck a young female repeatedly, carried her into the woods, and committed a sexual assault. He was convicted of abduction and first degree sexual assault, and on appeal contended that his abduction conviction was impermissible. We concluded that although the two convictions stemmed from the same criminal transaction, "[t]he abduction ... was more than incidental to the rape," 174 W.Va. at 659, 328 S.E.2d at 674, and that a separate conviction therefor was proper.

A similar conclusion was reached by the Supreme Court of Virginia in *Brown v. Commonwealth*, 230 Va. 310, 337 S.E.2d 711 (1985). In that case, the primary issue was the construction of the Virginia abduction statute. The defendant, Brown, was convicted of rape, forcible sodomy, and abduction. The Supreme Court of Virginia concluded that its Legislature "did not intend to make the kind of restraint which is an intrinsic element of crimes such as rape, robbery, and assault a criminal act, punishable as a separate offense." 230 Va. at 314, 337 S.E.2d at 713. For this reason, abduction was punishable "only when the detention committed in the act of abduction is separate and apart from, and not merely incidental to, the restraint employed in the commission of the other crime." 230 Va. at 314, 337 S.E.2d at 714.

We today reaffirm the result implicitly reached in *Trail*, and more explicitly detailed in *Miller*. Consequently, we conclude that a defendant cannot be convicted of abduction under W.Va.Code, 61–2–14(b), if the movement or detention of the victim is merely incidental to the commission of another crime. The factors to be considered in determining whether the abduction is incidental to the commission of another crime are the length of time the victim was held or moved, the distance the victim was forced to move, the location and environment of the place the victim was detained, and the exposure of the victim to an increased risk of harm.

■ Applying these factors to the case at hand, we are of the opinion that Lisa's abduction was not merely incidental to the assault. Lisa was seized and detained by the defendant in excess of one hour. In addition, she was moved a distance of some 150 yards from the relative safety of the hillside into thick underbrush. While this movement was intended by the defendant to decrease the risk of detection, it just as surely increased Lisa's risk of harm.

In this respect, the instant case is factually analogous to both *Trail* and *Miller*. In *Trail*, the victim was moved deeper into the woods to avoid detection; in *Miller*, the victim was transported to an isolated and

unfamiliar property. We concluded in each of these cases that the risk of injury was substantially increased and that the abduction was, therefore, not merely incidental to the assault. We reach the same conclusion in this case. For these reasons, we find that the defendant's abduction conviction was proper.

## IV.

In his final assignment of error, the defendant asserts that the State improperly failed to disclose the identity of two State witnesses in its discovery responses.[10] The defendant argues that the nondisclosure was prejudicial, and urges us to reverse the conviction under Syllabus Point 2 of *State v. Grimm*, 165 W.Va. 547, 270 S.E.2d 173 (1980):

> "When a trial court grants a pre-trial discovery motion requiring the prosecution to disclose evidence in its possession, nondisclosure by the prosecution is fatal to its case where such non-disclosure is prejudicial. The nondisclosure is prejudicial where the defense is surprised on a material issue and where the failure to make the disclosure hampers the preparation and presentation of the defendant's case."

Following *Grimm*, we discussed in some detail the late disclosure problem in *State v. Miller*, 178 W.Va. 618, 363 S.E.2d 504 (1987). We pointed out in *Miller* that Rule 16(d)(2) of the West Virginia Rules of Criminal Procedure[11] enables a trial court to impose sanctions that may have the effect of curing a late discovery problem.

John Michael Marstiller, a psychologist, was called by the State to testify concerning the effects of rape trauma syndrome.[12] In his testimony, he concluded that Lisa's inability to remember the details of the assault was consistent with rape trauma syndrome. His identity was not disclosed until the day of his testimony.

■ We do not find that the untimely disclosure of Mr. Marstiller as a State witness was prejudicial to the defendant. His interview of Lisa took place on the day before he was called to testify. Furthermore, the court offered a recess to permit the defendant to interview Mr. Marstiller before cross-examination. The defendant's attorney did not avail himself of this offer, but instead stated on the record that he was familiar with Mr. Marstiller and his qualifications.

■ The more troublesome question involves the testimony of Angela Garcia, a licensed social worker and counselor at a mental health facility in Elkins. Ms. Garcia counseled Lisa up to six times subsequent to the assault and again immediately prior to her testimony. The defendant asserts that her testimony was prejudicial, particularly insofar as she stated that Lisa was able to recreate aspects of the assault by puppet play.

The State's attorney represented, at the time he called Ms. Garcia to testify, that he was unsure whether Ms. Garcia would be available as a witness until she telephoned

---

**10.** The State correctly points out that the defendant did not file a formal discovery motion. We find, however, that a formal motion was unnecessary. A general order entered by the Randolph County Circuit Court on January 6, 1977, required the State to disclose, within twenty days of indictment, a list of "[t]he names and addresses of persons whom the [p]rosecuting [a]ttorney intends to call as witnesses" in that case. We have sanctioned the use of general discovery orders in prior cases. *See, e.g., Wilhelm v. Whyte*, 161 W.Va. 67, 69 n. 1, 239 S.E.2d 735, 736 n. 1 (1977).

**11.** Rule 16(d)(2), W.Va.R.Cr.P., provides:

"Failure to Comply with a Request.—If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances. The court may specify the time, place and manner of making the discovery and inspection and may prescribe such terms and conditions as are just."

**12.** We held in *State v. McCoy*, 179 W.Va. 223, 366 S.E.2d 731 (1988), that a qualified expert is permitted to explain rape trauma syndrome and to render an opinion whether the victim exhibits behavior consistent with that syndrome, but may not render an opinion on the ultimate issue of whether a sexual assault actually occurred.

at 10:00 p.m. the previous day. This is not borne out in the record. Ms. Garcia interviewed Lisa some three days prior to her testimony at the direction of the State's attorney. Surely the identity of Ms. Garcia could have been provided to the defendant at that point. We cannot condone these efforts by the State to conceal information that indisputably was subject to disclosure to the defendant.

We nevertheless conclude that the testimony by Ms. Garcia was not prejudicial. The defendant cross-examined Ms. Garcia effectively and demonstrated that Lisa's recreation of the assault with puppets was inconsistent with the testimony of the policeman who viewed the assault.[13] The testimony of Ms. Garcia was not unduly emphasized by the State in its closing argument. Furthermore, contrary to the defendant's assertions, Ms. Garcia's testimony was not the sole evidence of the assault. Eyewitness testimony by the policeman and certain admissions by the defendant also provided overwhelming evidence of guilt. We find, on authority of *Grimm*, that the nondisclosure was not prejudicial.

### V.

For the reasons set out above, the judgment of the Preston County Circuit Court is affirmed.

Affirmed.

---

**13.** Ms. Garcia stated that Lisa placed the puppets "head to head." The defendant characterized the assault as a "head to feet confronta-tion," and Ms. Garcia admitted this did not correspond "with her play with the dolls."